**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                 No. 26-CR-00146-SMD

OSCAR HERRERA,

      Defendant.

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

**THIS MATTER** is before the Court on Defendant's motion to suppress.  Doc. 31 ("Def.'s Mot. to Suppress").  Having considered the motion, the government's response, the motion hearing testimony, all tendered Exhibits, the parties' closing arguments, and the relevant law, the Court **DENIES** Defendant's motion to suppress. *See* Doc. 33 ("Gov't Resp."); Doc. 39 ("Def.'s Closing Arg."); Doc. 40 ("Gov't Closing Arg.").

**FACTUAL FINDINGS**

1. Officers Pull Defendant Over

On February 21, 2025, at around 11:15 pm, Deputy Madden from the Sierra County Sheriff's Department pulled over a Toyota Camry traveling north on I-25 for failure to maintain a lane.  Gov't Resp. at 2; Gov't Ex. 2 at 1.  The driver, Defendant Oscar Herrera, stopped his car on the side of the highway.  Gov't Ex. 2 at 2. Deputy Madden approached Defendant and asked for his license, but Defendant stated that he did not have his driver's license or wallet with him.  *Id.* Deputy Madden ran Defendant's identifiers, name and social security number, and determined that Defendant had an outstanding warrant from El Paso County.  Gov't Ex. 3 ("Madden Body

1

Camera") at 2:40–3:41. Deputy Zagorski[1] arrived shortly thereafter. *Id.* at 3:42–3:46. The deputies told Defendant that until they had figured out whether the warrant was valid, he would be detained and handcuffed. *Id.* at 3:46–3:55. Defendant readily complied. *Id.* at 4:00–4:15. Deputy Madden then called dispatch to cross-check the warrant. *Id.* at 4:40. The deputies asked Defendant whether he knew what the warrant would be for, but he said he had no idea. *Id.* at 5:00–5:05. Deputy Madden learned that the warrant was for aggravated robbery and permitted full extradition. *Id.* at 7:00–7:15. Deputy Madden followed up with dispatch to contact the El Paso County authorities. *Id.* While waiting for an update from dispatch, the deputies and Defendant cordially discussed Defendant's work, upbringing in El Paso, and so on. *See id.* at 7:20–16:11.

The Deputies also informed Defendant that, if the warrant was valid, he would be booked into jail in Deming, New Mexico until El Paso County could retrieve him. *Id.* at 21:25–21:51. El Paso confirmed the warrant and Deputy Madden told Defendant that he would transport Defendant. *Id.* at 25:40–26:00. Deputy Madden also advised Defendant that they would need to tow the vehicle, which was stationed on the side of the interstate, and asked whether he had any valuable or dangerous items in his car. *Id.* Defendant said he did not. *Id.* Deputy Madden did a second pat-down and retrieved $150 in cash from Defendant's person. *Id.* at 26:50–27:00. Defendant called his wife and Deputy Madden spoke to her, letting her know what was going on and where they were transporting Defendant. *Id.* at 27:30–28:30. Deputy Zagorski took Defendant's car key and asked if there was anything else he needed from his car. Gov't Ex. 5.1 ("Zagorski Body Camera 1") at 26:00–26:45. Defendant replied that there was a third cellphone in the front seat that he wanted to bring with him to jail. *Id.* After Deputy Zagorski recouped the

---

[1] The government frequently refers to Deputy Zagorski as "Deputy Zargoski." *See, e.g.*, Gov't Resp. at 3–5, 10, 13; Gov't Closing Arg. at 1, 2, 4, 6, 8, 9, 11, 17. The Court has corrected that spelling when quoting from the government's filings.

phone and handed it to Defendant, Deputy Madden transported Defendant to the Sierra County Detention Facility.  Gov't Ex. 2 at 2.

2.  Sierra County Towing Policy (Gov't Ex. 1 ("Vehicle Towing Policy"))

The Sierra County Towing and Inventory Policy states, in relevant part, that:

- Office members towing a vehicle shall complete a vehicle tow report.  The report should be submitted to the Records Section as soon as practicable after the vehicle is towed. *Id.* § 502.6.1.

- The contents of all vehicles towed at the request of the office members shall be inventoried and listed on the inventory report. When reasonably practicable, photographs may be taken to assist in the inventory.  *Id.* § 502.8 ("Vehicle Inventory").

- Closed containers located within the vehicle or any of the vehicle's compartments will not be opened for inventory purposes.  *Id.* § 502.8(d).

- Members should ask occupants whether the vehicle contains any valuable or hazardous materials . . . If the occupant acknowledges that any closed container contains valuables or a hazardous material, the container shall be opened and inventoried. *Id.* § 502.8.

- A copy of the vehicle inventory will be given to the tow truck operator.  *Id.*

*See* Vehicle Towing Policy at 2–3.  The government submits that this policy was in place at the time of Defendant's arrest and guided the deputies' search.  Gov't Resp. at 3–4; Gov't Closing Arg. at 2, 8.  However, Deputy Zagorski's testimony calls that representation into doubt.  When the government presented the above policy to Deputy Zagorski, he was asked whether it was "the same tow and inventory policy that [he] was trained and operating under that evening."  Deputy Zagorski said that it had been updated within the past six months (the search in this case occurred approximately 14 months ago) but affirmed that it still reflected the practice he was acquainted with.  Yet, on cross examination, Deputy Zagorski testified that the prior policy had a different closed container provision which had been "recently changed to where we're not supposed to open containers within the vehicle anymore."  Defendant asked whether the policy shown in Exhibit 1 was the "actual policy" in effect on February 21, 2025.  Deputy Zagorski replied that it was not

3

and that he was unsure whether the pertinent policy had been turned over to the Government. The Court also notes that the policy is dated April 24, 2025, which is after the date of the search in question. *See* Vehicle Towing Policy at 1. And, lastly, the Court highlights that while the government relies heavily on the inventory nature of this search, no written tow inventory has been submitted for the Court's review and Deputy Zagorski's testimony that he normally records inventory searches on his body camera conflicts with the policy's repeated insistence on a written report.

3.   Officers Search the Vehicle

After Deputy Madden left with Defendant, Deputy Zagorski and Deputy Marin began to look through the vehicle. Deputy Zagorski's started with the front passenger seat. Zagorski Body Camera 1 at 27:44–28:22. He lifted the lid of the middle console and pulled out a cinched purple cloth bag and a nylon pack resembling a lunch box. *Id.* He uncinched the purple pouch and unzipped the pack. *Id.* The purple bag contained what appear to be a large number of quarters and the nylon case contained something resembling cash. *Id.* Deputy Zagorski's first body camera video ends with him shining his flashlight on the backseat and then returning to his car. *Id.*

When Deputy Zagorski's body camera resumed filming, he was in front of the open trunk and speaking on the phone with Deputy Madden, who was then at bookings with Defendant. Gov't Ex. 5.2 ("Zagorski Body Camera 2") at 00:01–00:10. There is no footage of when Deputy Zagorski first opened the trunk nor is there footage of him inventorying the backseat, the driver's seat, or the glove compartment.[2] However, he did testify that he usually moves from the passenger side to the driver's side and then to the back side. *See also* Gov't Ex. 2 at 2 (stating that Deputy

---

[2] Before Defendant is transported, Deputy Zagorski shines his flashlight through the windows of Defendant's car, including in the driver's seat and back seat, but there is no footage of Deputy Zagorski inventorying these areas after he has access to the vehicle, i.e., he does not actually go through the contents of these areas or name any items he finds. Zagorski Body Camera 1 at 25:00–25:15.

Zagorski had "checked the driver seat area and then the rear seat"). Deputy Marin's body camera is on as well at this point. Gov't Ex. 4 ("Marin Body Camera"). When Deputy Marin reached the car Deputy Zagorski immediately remarked that all he could smell was laundry detergent, that there were no dirty clothes in the trunk, and that he saw one laundry pod. *Id.* 00:06–00:18. According to Deputy Zagorski's testimony, it was at this point that his "focus changed from the tow inventory to a criminal investigation." Deputy Zagorski found three primary items in the trunk—a cardboard box, which was wet on the bottom and partially sticking out of a plastic bag, a second, dry cardboard box sealed with duct tape, and a zippered black duffle bag. Gov't Resp. at 3.

Deputy Zagorski instructed Deputy Marin to flip the second sealed box over. Marin Body Camera at 1:48–1:50. The bottom of the box was closed with clear packing tape. *Id.* at 1:51–2:00. The flaps did not quite meet and left a small one-inch window down the center. *Id.* Without pressing onto the box, but with his flashlight aimed at the gap, Deputy Zagorski could see napkins and "Ziploc baggies or something." *Id.* Deputy Marin then took the flashlight from Deputy Zagorski, lifted the flap slightly, and pressed the flashlight onto the tape. *Id.* at 2:05–2:20. Deputy Zagorski testified that the deputies' purpose in handling the box was to see inside of it. Deputy Marin's body camera then moved below the top of the box, obstructing the view of what Deputy Zagorski did while he looked into the box. *Id.* at 2:05–2:20. However, after a few moments, Deputy Marin said, "Packages?" and Deputy Zagorski replied "Yeah . . . and there's a tide pod in there." *Id.* They began discussing getting a canine unit to the scene. *Id.* at 2:30–2:40. Deputy Zagorski added that he planned to apply for a search warrant because he was "pretty sure it [was] a load." *Id.*

Deputy Zagorski called Deputy Madden, who stepped out of the room where Defendant was located to take the call, and advised him that the trunk smelled of laundry detergent and that he found a sealed box in Defendant's trunk containing several individually wrapped packages, resembling keys of cocaine. Zagorski Body Camera 2 at 0:40–0:44; Marin Body Camera at 4:30–5:45. Deputy Madden seemed unsurprised, mentioning that he "knew something was up" and "that's why [he]. . ." Marin Body Camera at 4:26–4:32. The audio becomes too muffled to hear the end of Deputy Madden's sentence. *Id.* After the deputies' initial conversation, Deputy Madden returned to the room and began questioning Defendant about the box. He first said, "Hey so while the officers were inventorying the car . . . what's in the trunk in the box?" *Id.* at 6:13–6:18. Defendant clarified that Deputy Madden was asking about a box in the trunk. *Id.* at 6:19–6:30. Deputy Madden repeated "Yeah, inside the trunk, do you know what's in there? Or no?" Defendant responded that there's a box with oil. *Id.* Deputy Madden pressed slightly, "A box with oil? Nothing else?" "No sir." *Id.* Deputy Madden told Defendant that "There's a box in your trunk I guess with tape on it." *Id.* at 6:38–7:00. Defendant maintained that he did not know what the box would be, and that the only items he was aware of in the trunk were the box with a gallon of oil and tacones (high heels). *Id.* Deputy Madden asked, "There's nothing there?" and inquired into if anyone else would have had access to the car. *Id.* at 7:05–7:35. Defendant denied that someone else would have placed a package in the trunk. *Id.* Defendant Madden made one more attempt to get information from Defendant— "Anything else? Nothing inside of it? No bombs, guns?" *Id.* at 7:36–7:54. And, once more, Defendant said no. *Id.*

After Defendant repeatedly refuted there being anything else in the trunk, Deputy Madden stepped back outside the room to continue his conversation with Deputies Zagorski and Marin. Deputy Zagorski told Deputy Madden that he believed it would be best to request a search warrant.

*Id.* at 8:06–9:24.  Defendant Madden then offered to *Mirandize* Defendant and ask for his consent to open the boxes.  *Id.*  The deputies all agreed.  *Id.*  Once Deputy Madden returned to the room with the Defendant, he advised him of his *Miranda* rights, and he had the following exchange with Defendant:

> **Deputy Madden**: Do you understand these rights as I've explained them to you?
>
> **Defendant**: Yes, sir.
>
> **Deputy Madden**: Having these rights in mind, are you willing to answer my questions?
> …
> **Defendant**: Yes, sir.
>
> **Deputy Madden**: Okay so there's a box inside your trunk and it has duct tape on it and it's sealed.  Do you give the deputies on scene permission to open that box up and look at what's inside of it?
>
> **Defendant**: Does it matter?[3]  I don't know nothing about those boxes.  If they wanna open it they can open it.
>
> **Deputy Madden**: Okay so you have, okay so you give them permission?
>
> **Defendant**: To open?
>
> **Deputy Madden**: To open the box yes.
>
> **Defendant**: Sure, why, why not?

*Id.* at 9:40–10:46.  Deputy Zagorski cut through the tape and Deputy Marin took out ten tightly wrapped white packages of roughly the same shape and size and covered in oil.  *Id.* at 10:50–12:55.  Six of the packages were black and four were white.  Gov't Resp. at 6.  One of the white packages was covered in an oil, tightly wrapped in plastic, and marked with an "A" in sharpie.  *Id.* The deputies sealed the vehicle and had it towed to the Sierra County Sheriff's office.  *Id.*  The

---

[3] The Court notes that the audio of Deputy Madden speaking with Defendant is somewhat muffled and, though it believes Defendant says "does it matter?" it is possible he instead replied "doesn't matter."

deputies also contacted the United States Border Patrol K9 Unit. *Id.* Border Patrol Agent Alvarez and K9 "Cora" conducted an exterior sniff and Agent Alvarez indicated that K9 "Cora" positively alerted to the presence of narcotics[4] in the vehicle. *Id.*

4. Deputies Obtain a Search Warrant

The next day, on February 22, 2025, Deputy Madden sought a search warrant. Gov't Ex. 2 at 1. Deputy Madden detailed his interaction with the Defendant, from the beginning of the stop to transport, and incorporated Deputy Zagorski's observations—the odor of laundry detergent, despite the absence of a detergent bottle or clothing, and two boxes sealed with tape. *Id.* at 2. He relayed that when Deputy Zagorski shone his light through the clear packing tape, he "observed several white packages within the sealed box." *Id.* The warrant affidavit then narrates the conversation between Deputy Madden and Defendant, the 10 wrapped blocks retrieved from the sealed box, and that this method of packaging comports with Deputy Zagorski's training on controlled substances. *Id.* Based on this information, the court granted the deputy's search warrant. *Id.* at 4.

A full search of the trunk, including the second duct-taped box and the duffle bag, uncovered additional packages. Gov't Resp. at 6. Ultimately, the deputies found 30 bundles in the vehicle. *Id.* A field test was conducted on each one of each color package and all returned a presumptive positive for cocaine. *Id.* The government charged Defendant with one count of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii): Possession with Intent to Distribute 5 Kilograms and More of Cocaine.

---

[4] According to the search warrant, K9 "Cora" "alerted to the presence of narcotics/concealed humans." Gov't Ex. 2 at 3. However, no concealed humans were found in the vehicle. So, the alert logically was to the odor of drugs.

**DISCUSSION**

"The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Warrantless searches are per se unreasonable and his protection applies with equal force to containers and packages. *Katz v. United States*, 389 U.S. 347, 357 (1967); *United States v. Bonitz*, 826 F.2d 954, 957 (10th Cir. 1987). "Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable." *United States v. Jacobsen*, 466 U.S. 109, 114 (1984). The government can, however, admit evidence procured via a warrantless search, including evidence found in a closed container, if that search comes within one of the Fourth Amendment's "specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357; *Bonitz*, 826 F.2d at 957.

Defendant's central contention is that the deputies violated his Fourth Amendment rights when they manipulated the cardboard box to see inside. Def.'s Mot. to Suppress at 1, 3. If that search was illegal, Defendant believes that it invalidates everything the government procured afterwards—his consent, probable cause, and the warrant—and thus mandates suppression. *Id.* In response the government asserts that the deputies' initial examination of the box was part of a lawful inventory search and regardless, its taint was purged from Defendant's consent, discovery was inevitable, and the deputies had probable cause. *See* Gov't Closing Arg. at 5–17.

I.       Whether the Government Conducted an Inventory Search of Defendant's Vehicle.

The Court begins with the inventory search exception. An officer's routine inventory search of a lawfully impounded vehicle is a well-delineated exception to the prohibition on warrantless searches. *Colorado v. Bertine*, 479 U.S. 367, 370 (1987); *United States v. Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997). To avail itself of this doctrine, the government must show that (1) the officer acted pursuant to a standardized policy and (2) that policy was designed

9

to produce an inventory and serve the administrative purposes of such searches. *Haro-Salcedo*, 107 F.3d at 772–73; *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003). The policy must also include established criteria for the opening of containers. *Florida v. Wells*, 495 U.S. 1, 4 (1990). That criteria can instruct officers to open all closed containers, but it cannot leave that decision to the officers' discretion. Unfettered authority to investigate closed containers quickly converts an inventory search into "a ruse for a general rummaging in order to discover incriminating evidence." *Id.*

Defendant argues that the deputies violated his Fourth Amendment rights when they flipped the box over, lifted its flaps, oriented it to expose an opening, and pressed through the tape with a flashlight. Def.'s Mot. to Suppress ¶ 9. He asserts that these actions contravened the towing policy's prohibition on opening closed containers and therefore exceeded the scope of a valid inventory search. *Id.* ¶ 12; Gov't Resp. at 8. The government concedes that Deputy Zagorski pressed on the box. Gov't Closing Arg. at 4. However, the government maintains that Deputy Zagorski dutifully adhered to the Sierra County Policy; he simply moved the container and then peered inside with a flashlight. They emphasize that the "integrity of the cardboard box and tape remained intact" and that the flashlight had to be pressed against the tape to adequately illuminate the inside. Gov't Resp. at 9.

A. <u>The government has not established that a standardized policy controlled the deputies' opening of closed containers at the time of the search.</u>

Before analyzing the deputies' handling of the sealed box, the Court must address a foundational defect in the government's inventory search argument; the government fails to establish what standardized policy the Sierra County Sheriff's Office had for inventory searches and for opening closed containers at time of Defendant's arrest. It is the government's burden to demonstrate that the deputies opened closed containers "pursuant to a standardized policy." *Wells*,

495 U.S. at 4; *United States v. Davis*, 87 F. App'x 94, 98 (10th Cir. 2004).  Defendant underscores that the government "has never produced in discovery or otherwise the policy in effect."  Def.'s Closing Arg. at 1.  The Court agrees.  Deputy Zagorski specifically stated that the policy shown in Exhibit 1 is different than the operative policy in February of 2025 and that the closed container policy prior to the adoption of the policy contained in Exhibit 1 was less restrictive than the newly adopted one.  The government made no attempt to address this inconsistency on re-direct examination, and has not made any attempt to supplement the record with the policy in effect on the date of Defendant's arrest.  The government merely showed Exhibit 1 to Deputy Zagorski at the beginning of his testimony, but did not elicit testimony from Deputy Zagorski about the specifics of this or the prior policy, and did not clarify that Deputy Zagorski complied with whatever was effective on February 21, 2025.  The government had an opportunity to address this confusion in its closing argument.  However, the government instead continues to treat Exhibit 1 as the operative policy.  It ingeminates that Deputy Zagorski "began the inventory of the vehicle pursuant to Sierra County Towing Policy 502," that he "continued to inventory the contents of the trunk pursuant to the policy," and that "the deputies complied with the departmental policy of inventory."  Gov't Closing Arg. at 8–9.  Though these statements parrot the language of *Wells* and *Bertine*, they lack the underlying evidence necessary to substantiate their assertions.

The government's omission could be excusable given Deputy Zagorski's testimony that, although Sierra County has since changed the policy, those amendments did not substantively alter officers' inventory search practices.  However, that inference can only make up so much ground.  Deputy Zagorski made it clear that the current closed container provision is not comparable to the prior one.  The Court does not doubt that Deputy Zagorski was acting in accordance with *some* policy, but it cannot surmise what that policy was from the record.  This evidentiary void

11

compromises the remainder of the government's justification as to why the deputies needed to peer inside the sealed box. For instance, the government insists that Deputy Zagorski had to press on the box with a flashlight "to properly document the contents as part of the inventory." Gov't Closing Arg. at 2. There is no corroborating proof that Sierra County's old policy instructed officers to document the contents of closed containers, and that practice is clearly not supported by the policy contained in Exhibit 1. In sum, the government has not shown what Sierra County's inventory search policy was on February 21, 2025, how it regulated the opening of closed containers, or whether the deputies complied with its terms. *Wells*, 495 U.S. at 4. The government has therefore failed to fulfill the first prong of the inventory search exception. *Tueller*, 349 F.3d at 1243.

    B. <u>The deputies significantly departed from the purported operative policy.</u>

Nevertheless, without any other policy to analyze, the Court considers whether Deputy Zagorski's conformed with the submitted policy and acted for an administrative purpose. The Court finds he did not. Defendant contends that Deputy Zagorski's manipulation of the cardboard box is what took him outside the scope of Sierra County's policy. The government concedes that Deputy Zagorski pressed on the box with a flashlight but rejects the notion that this contravened policy since it did not constitute "opening" the box. Gov't Resp. at 8. The government then urges that, even if Deputy Zagorski deviated from standard practices, that error is not enough to invalidate an inventory search. They emphasize that so long as the search is "administered in good faith," the Fourth Amendment is satisfied regardless of whether the officers "implement those procedures in a 'somewhat slip-shod' manner." *Id.* at 9 (quoting *Bertine*, 479 U.S. at 370).

The government is correct that not every aberration in an inventory search yields a constitutional violation. *Bertine*, 479 U.S. at 370. For instance, an officer's failure to list certain

12

items on the inventory report will not render the inventory search unconstitutional so long as he or she "largely compl[ies] with department policy." *United States v. Ulibarri*, 149 F.4th 1193, 1201 (10th Cir. 2025).  Still, "the inventory search exception is not limitless." *United States v. Andas-Gallardo*, 3 F. App'x 959, 964 (10th Cir. 2001).  Significant departures from policy may warrant suppression.  Accordingly, in *United States v. Lugo*, 978 F.2d 631 (10th Cir. 1992), the Tenth Circuit found that the inventory search exception did not apply to "searching behind the door panel of a vehicle."  The officers' conduct did not "qualify as 'standard police procedure'" nor did it "serve the purpose of 'protecting the car and its contents' under any normal construction of those terms." *Id.* at 637.

Comparable problems pervade the search in this case.  Recall that an inventory search is intended to protect the defendant's property while in police custody, to shield the police from claims of lost or stolen property, and to protect the police from potential dangers. *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).  When completing an inventory search, the officer must be at least partially motivated by these administrative objectives. *Cf. United States v. Cecala*, 203 F.3d 836 (10th Cir. 2000) ("[A]n inventory search may be justified by a legitimate inventory purpose despite an officer's subjective desire to uncover criminal evidence.").  The written policy abides this principle; it enumerates several steps that would produce a lawful inventory.  Vehicle Towing Policy at 2–3.  Officers are expected to complete a vehicle tow report, to denote items of value, and to provide a copy of that report to the tow truck operator and the Records Section. *Id.* at 2.  Deputy Zagorski understood that these were the animating objective of an inventory search; he testified that an inventory search protects the tow truck driver and agency from baseless allegations of lost property.

Of course, a policy is only as good as its implementation.  And the evidence presented does not suggest that the deputies adhered to the policy in any meaningful sense.  The government puts forth that the deputies inventoried and documented the contents of the vehicle "with photographs and by the body-worn cameras of Deputies Zagorski and Marin."  Gov't Resp. at 3.  First, that method does not heed the expectation that officers list the vehicle's contents on an inventory report, nor that they provide a copy of the report to the tow truck operator.  Vehicle Tow Policy § 502.8.  While the policy permits officers to use photographs to supplement their written documentation, the government has not produced the accompanying report nor has it submitted any photographs from the inventory search.  *Haro-Salcedo*, 107 F.3d at 773.  These missing pieces undermine the officers' purported administrative purposes.  *United States v. Howe*, 313 F. Supp. 2d 1178, 1186 (D. Utah 2003), *aff'd*, 139 F. App'x 61 (10th Cir. 2005) ("The officers' failure to comply with Roy City Police Department written policies regarding inventory searches renders the warrantless search unreasonable.").[5]  Indeed, it is doubtful that the deputies could protect themselves or the tow company against liability without some annotation of the car's contents.

Still, the government could perhaps establish that the deputies were serving an administrative purpose by producing evidence of an alternative catalog.  *See, e.g.*, *United States v. Veale*, 734 F. Supp. 3d 1169, 1180 (D.N.M. 2024) ("[A]lthough agents did not create a DEA-12 form with a complete inventory of all items, they effectively fulfilled this requirement by taking photographs of the Defendant's bags and the items within.").  *But see United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003) ("[O]ur research has not revealed a case allowing the written

---

[5] There is a distinction between an inventory search that is completed pursuant to an unwritten policy and an inventory search that conflicts with written policy; the Court confronts the latter scenario in this case.  *Compare United States v. O'Neil*, 62 F.4th 1281, 1292 (10th Cir. 2023) ("Our precedent does not require the government to produce standard inventory procedures in writing."), *with Rowland*, 341 F.3d at 780 ("[O]ur research has not revealed a case allowing the written procedures of law enforcement to be eroded by unwritten practice.").

procedures of law enforcement to be eroded by unwritten practice."). The Court accepts Deputy Zagorski's testimony that he typically documents an inventory search using his body camera. Yet, even assuming that body camera footage is a permissible substitute for a written report, the available footage does not evince an administrative purpose. Deputy Zagorski first looked in the front seat and opened the middle console. Zagorski Body Camera 1 at 27:44–28:22. He then took out two items, a cinched purple cloth bag and a small rectangular nylon pack that is zippered shut. *Id.* He promptly opened both items.[6] *Id.* After he placed those items back in the console, he briefly shone his light on the back seat and then returned to his patrol car.

The record provides no information on what happened between Deputy Zagorski's initial scan of the front passenger seat and the deputies looking into the trunk. His glimpse into the back seat reveals several items, including what appears to be a stuffed animal, but he is not seen inventorying them or stating aloud what they are. There is also no footage of the glove compartment, the driver's side front seat, auxiliary items, or his initial opening of the trunk, although he testified that the tow inventory report includes a checklist for seat covers, spotlights, the spare tire, etc.

The Court finds that the proffered evidence cannot sustain the conclusion that the deputies were following an "administrative procedure designed to produce an inventory." *Haro-Salcedo*, 107 F.3d at 773. The government has failed to offer a written inventory, photographs, or complete video footage. The Court cannot discern a connection between the administrative purposes articulated in the policy and during Deputy Zagorski's testimony—protecting the government and tow truck operators against liability or harm—and the actions taken. *Lugo*, 978 F.2d at 636 ("[A]

---

[6] The cloth bag and nylon pack were undoubtedly closed containers that should not have been opened per the available policy. Vehicle Towing Policy § 502.8(d) ("Closed containers either within the vehicle or any of the vehicle's compartments will not be opened for inventory purposes.").

15

warrantless inventory search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of "protecting the car and its contents.'"). The inventory search exception therefore does not apply.

II.    Whether the Evidence Would Have Been Inevitably Discovered.

The government makes the alternative argument that the deputies would have inevitably discovered the box's contents. Gov't Closing Arg. at 14. Courts apply the inevitable discovery exception where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification." *United States v. Shrum*, 908 F.3d 1219, 1235 (10th Cir. 2018).

A. <u>A proper inventory search would not have revealed the wrapped packages inside the box.</u>

The government does not discuss whether the contested evidence would have been discovered during a lawful inventory search. The Court addresses this possibility for thoroughness and because the government was seemingly unaware of the holes in its inventory search argument. If an officer completes an unlawful or invalid inventory search, the government can "rely on a hypothetical inventory search" to show that the evidence would have been uncovered during a lawful search. *United States v. Martinez*, 512 F.3d 1268, 1274 (10th Cir. 2008). The Tenth Circuit has "repeatedly applied the inevitable discovery doctrine to cases involving, as here, an improper inventory search that was preceded by a lawful impoundment." *United States v. Sitlington*, 527 F. App'x 788, 792 (10th Cir. 2013). The hypothetical findings are cabined to what would happen during "a search [that] would not have transgressed its administrative purposes." *Martinez*, 512 F.3d at 1274.

16

The Court finds that during a properly conducted inventory search, the deputies would have uncovered the sealed box, but would have only seen napkins and "something like" Ziploc baggies inside of it.  Marin Body Camera at 1:51–2:00.  The deputies would not have discovered the detergent pods or seen the wrapped packages.  The Court acknowledges that this case presents an exceptionally close call and the line between picking up a box and looking into it is thin.  A few key circumstances lead to this conclusion.

First, the Sierra County Towing Policy, submitted as Exhibit 1, unequivocally prohibits opening closed containers.  Closed containers shall not be opened unless the occupant "acknowledges that any closed container contains valuable or a hazardous material."  Vehicle Towing Policy § 502.8.  In light of this policy, the government's claim that Deputy Zagorski needed to "observe what was inside the box to properly document the contents as part of the inventory" is unavailing.  Gov't Closing Arg. at 2.  Defendant had denied that his car had anything valuable inside of it.  Madden Body Camera at 25:40–26:00.  Thus, at most, the deputies needed to move the box to look in the trunk's spare tire compartment and flip it over to determine whether it was closed.  There is no contention that it was an unsealed container. *See* Zagorski Body Camera 2 at 0:40–0:44 (Deputy Zagorski informing Deputy Madden that he found a sealed box in Defendant's trunk).  And Deputy Zagorski testified that the prevailing practice is to "just document [the closed box] and just the describe the container or item that it is."  An officer can easily describe the container without looking into it.  A lawful inventory search would have been limited to the officers seeing the box, flipping it over, realizing it was sealed, and describing the container itself—but not its contents—on an inventory report. *Martinez*, 512 F.3d at 1274; *cf. United States v. Neugin*, 958 F.3d 924, 933 (10th Cir. 2020) (finding that community-caretaking function did not require officer to "stand behind the tailgate, lift the camper's hatch, or look into the bed of the truck").

17

Second, accepting that the deputies could shine a flashlight on the clear tape, the only items Deputy Zagorski could see in his plain view were napkins and "Ziploc baggies or something." Marin Body Camera at 1:51–1:55. The box did not reveal its contents through its configuration, smell, or feel. *United States v. Muhtorov*, 20 F.4th 558, 598 (10th Cir. 2021). Nor were the deputies positioned to observe the contents absent physical manipulation. *United States v. Cruz-Mendez*, 467 F.3d 1260, 1266 (10th Cir. 2006). Indeed, it was not until Deputy Marin takes the flashlight, slightly lifts the flap, and presses the flashlight onto the tape that they can see detergent pods and packages. Marin Body Camera at 2:05–2:20. At the hearing Deputy Zagorski affirmed that his intent in handling the box and pushing on the flaps was to "see inside of it." The Court finds it was at that moment—when the deputies went from looking at the container to manipulating its form and peering inside—that the search exceeded the policy's scope. *United States v. Montes-Ramos*, 347 F. App'x 383, 389–90 (10th Cir. 2009) ("[A] police officer's intentional act of intruding a vehicle's air space, even if by only a few inches, constitutes a search."); *Silverman v. United States*, 365 U.S. 505, 512 (1961) (refusing to uphold an "actual intrusion into a constitutionally protected area" despite the fact the intrusion was "by even a fraction of an inch"). The evidence that flowed from that intrusion into the closed container, namely the tightly wrapped packages, would not have been inevitably discovered. Finding otherwise asks the Court to make unfounded inferences about what the officers could have seen or what may have transpired regardless of the "historical facts." *Shrum*, 908 F.3d at 1235. Such conjectures stray too far into speculation. *Id.* The Court concludes that a lawful inventory search would not have revealed the wrapped bundles or the detergent pods. *Neugin*, 958 F.3d at 935 (finding that police officer would not have inevitably found ammunition or run criminal history check had he not lifted the lid of the camper attached to the back of a truck).

18

B.  The deputies would not have inevitably obtained a search warrant without intruding into the box.

The government maintains that the deputies would have inevitably uncovered the box's contents because they would have obtained a warrant.  Gov't Resp. at 12.  When the government invokes the inevitable discovery exception based on an eventual warrant, the court considers the following factors:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*United States v. Cunningham*, 413 F.3d 1199, 1203–04 (10th Cir. 2005).  "Ultimately, the court must examine each contingency that would need to have been resolved in favor of the government and apply the inevitable discovery doctrine 'only when it has a high level of confidence' that the warrant would have been issued and the evidence obtained." *United States v. Christy*, 739 F.3d 534, 541–42 (10th Cir. 2014).  The first and third factors are not at issue here; the officers had not taken any steps to obtain a warrant at the time of the illegal search, but they did ultimately obtain one.  Gov't Closing Arg. at 16–17.  Because the Court concludes that the deputies had inadequate support for probable cause, absent the illegally obtained information, it does not reach the fourth factor.  *Id.* at 543 ("[I]nevitable discovery requires 'probable cause plus a chain of events that would have led to a warrant.'").

1.  The deputies did not have probable cause to search the interior of the box.

"Probable cause exists when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed and that

19

the person or property was involved in the crime." *Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017). The government contends that probable cause was supported by: the deputies' training and experience, the odor of laundry detergent combined with the lack of apparent clothing, the lack of obvious laundry detergent bottles or detergent boxes in the trunk, Defendant's verbal consent to open a sealed box from the trunk, "ten individually wrapped packages which appeared to be the same shape and size, tightly wrapped in clear plastic, and covered in oil with the marking 17 'A' in black permanent marker," and the exterior sniff of the vehicle revealing a positive alert to the presence of narcotics/concealed humans in the vehicle. Gov't Closing Arg. at 16–17. The government errs in including Defendant's consent, the packages, and the canine sniff as evidence of probable cause at this stage of the inquiry. Inevitable discovery asks whether the government would have obtained a warrant "independent of the search" through lawful means. *United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000); *Nix*, 467 U.S. at 444. The deputies did not ask for Defendant's consent or consider contacting a canine unit until after they investigated the box. Marin Body Camera at 2:30–2:40. And, again, assuming that these events would have taken place independent of the search veers into speculation. *Shrum*, 908 F.3d at 1235. The government cannot include the unlawfully uncovered packages, and the events that stemmed from that investigation, as proof of inevitable discovery.

What remains is the deputies' training and experience and the odor of laundry detergent, without any apparent clothing or laundry detergent bottles. Smelling laundry detergent or other masking agents bolsters probable cause. However, it does not, on its own, justify a reasonable search for drugs. *See United States v. Villa-Chaparro*, 115 F.3d 797, 802 (10th Cir. 1997) ("[T]he scent of a masking agent alone is insufficient to establish reasonable suspicion."); *United States v. Alvarez*, 68 F.3d 1242, 1245–46 (10th Cir. 1994) (J., McKay, concurring) ("Standing alone, air

20

freshener is not sufficient to justify a reasonable search for drugs . . . [but] coupled with other indicia of criminal activity, [it] supports a reasonable brief inquiry."). Applying this rule, the Tenth Circuit found that officers had an objectively reasonable suspicion of criminal activity to justify an investigative detention where air freshener was combined with other suggestions of illicit activity. *United States v. Toledo*, 139 F.3d 913 (10th Cir. 1998) (unpublished table decision). There, the defendant gave a self-contradictory statement of his travel plans, his rental car emitted a "strong odor" of air freshener, he had a previous drug conviction, and he acted nervously.

But in *Toledo* the government needed only to show reasonable suspicion to justify a brief *Terry* detention. *Id.* at *3. The standard of proof for reasonable suspicion is "obviously less than is necessary for probable cause." *Prado Navarette v. California*, 572 U.S. 393, 397 (2014). Probable cause therefore undoubtedly demands more than just the scent of a masking agent. For example, in *West*, the Tenth Circuit found that the government had probable cause to search the defendant's trunk because the scent of air freshener was accompanied by the defendant acting "in an extremely nervous manner throughout the encounter," and the smell of methamphetamine. *United States v. West*, 219 F.3d 1171, 1178–79 (10th Cir. 2000).

The government has not coupled the odor of laundry detergent with other indicia of criminal activity. Defendant was not nervous (the government characterizes him as compliant and the encounter cordial), had no prior drug convictions (his outstanding warrant was for aggravated robbery), and he did not contradict himself. Gov't Closing Arg. at 11. The potency of the laundry detergent is insufficient. *Cf. Toledo*, 139 F.3d at *3. The Court therefore finds that the government did not have probable cause and, as a result, has not shown that the deputies "would have successfully obtained a warrant independent of the illegal search." *Christy*, 739 F.3d at 534. The

21

government's failure to establish probable cause also precludes application of the automobile exception. *See* Gov't Closing Arg. at 12.

III.     Whether Defendant Consented to the Government's Search of the Box.

Defendant alleges that his consent for the deputies to search the box was involuntary because it was given while he was in custody and handcuffed. Def.'s Closing Arg. at 2. Whether a defendant's consent was voluntary is a question of fact and is assessed from the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973). The government bears the burden of proving, by a preponderance of the evidence, that the consent was "unequivocal and specific, freely and intelligently given, and not the product of duress or coercion." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007); *United States v. Guillen*, 995 F.3d 1095, 1104 (10th Cir. 2021). The Court considers the following factors when determining whether a defendant's consent was voluntary:

> the threatening presence of several officers; the display or brandishing of weapons; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of personal effects such as identification, plane or bus tickets; request to accompany officer to the station; interaction in a nonpublic place; absence of other members of the public; the administration of *Miranda* warnings; use of physical violence; oral threats; promises, inducements, deception, trickery; the physical and mental condition and capacity of the defendant; and whether the police informed defendant of the right to refuse consent.

*United States v. Romero*, 247 F. App'x 955, 963 (10th Cir. 2007).

A. Defendant's consent was voluntarily and intelligently given.

The strongest factors counseling against voluntariness—and the ones Defendant relies on—are that he was handcuffed, in custody, and in a non-public space with only an officer when he offered his consent. Def.'s Closing Arg. at 2; *cf. United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007) (noting that asking for consent "in broad daylight on an interstate highway" supported voluntariness); *United States v. Silva-Arzeta*, 602 F.3d 1208, 1215 (10th Cir. 2010)

22

(noting that asking for consent on a public street supported voluntariness).  However, arrest and detention do not nullify consent.  *United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993); *Contreras*, 506 F.3d at 1037.  Defendant has not presented any other evidence undermining the voluntariness his consent.  *See* Def.'s Closing Arg. at 2.  The conversation between himself and Deputy Madden was polite, as was the rest of their encounter prior to detention, and did not include any deception, inducement, or threat.  Marin Body Camera at 6:13–10:46.  Deputy Madden also *Mirandized* the Defendant and twice confirmed that Defendant was giving the officers permission to open the box in his trunk.  Marin Body Camera at 9:40–10:46; Zagorski Body Camera 2 at 3:40–4:46; *see United States v. Davis*, 636 F.3d 1281, 1293 (10th Cir. 2011) ("Even after receiving consent, the trooper inquired to confirm Davis was in fact consenting to a search of the vehicle, and Davis confirmed his consent.").  Defendant's consent was freely and intelligently given.

B.  The prior illegal search did not taint Defendant's consent.

Defendant advances that even if his consent was voluntary, it was the result of the government's unlawful conduct and is therefore fruit of the poisonous tree.  Def.'s Closing Arg. at 2; *see United States v. Maez*, 872 F.2d 1444, 1454 (10th Cir. 1989).  To invoke the fruit of the poisonous tree doctrine, a defendant must first show "a factual nexus between the illegality and the challenged evidence."  *United States v. Nava–Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).  At base, a factual nexus demands but for causation between the challenged evidence and the government's misconduct.  *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006).  The burden then shifts to the government to "establish a break in the causal connection between the illegality and the evidence thereby obtained."  *United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994).

23

The Court finds that Defendant has met his initial burden; Deputy Zagorski would not have called Deputy Madden and asked for consent to open the box but for his discovery of the wrapped packages. The government rebuts that Defendant's consent was so attenuated from the illegal search that it was purged of any unlawful taint. Gov't Closing Arg. at 5; *Wong Sun v. United States*, 371 U.S. 471, 473 (1963). Attenuation occurs "when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Shrum*, 908 F.3d at 1235. Three factors guide this analysis: (1) the temporal proximity between the police illegality and the consent to search; (2) the presence of intervening circumstances; and particularly (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 597 (1975); *Melendez-Garcia*, 28 F.3d at 1054. The government bears a "heavy burden" in establishing these factors. *United States v. Fox*, 600 F.3d 1253, 1262 (10th Cir. 2010).

The Court must first address the government's faulty understanding of temporal proximity and intervening circumstances. The government states that the Court must measure the "temporal proximity of the arrest and the confession." Gov't Closing Arg. at 9. Applying that rule to this case, the government identifies the starting point as when "Defendant was stopped by Deputy Madden on February 21, 2025, at approximately 11:15 PM" and the end point as when he "was read *Miranda* on February 22, 2025, at approximately 12:03 AM." *Id.* at 10. Thus, on the government's read, the relevant temporal proximity is 48 minutes. That calculation is incorrect. Temporal proximity stretches from the time of the officers' *illegal* conduct until the time of the defendant's consent.[7] *Fox*, 600 F.3d at 1259 (finding close temporal proximity between unlawful

---

[7] It is unclear why the government cuts temporal proximity off when Deputy Madden begins reading Defendant his *Miranda* rights, rather than when Defendant gave consent. However, because these events took place only moments

24

seizure and subsequent consent); *Shrum*, 908 F.3d at 1237 ("Defendant had little time to exercise 'free will' between the unlawful seizure of his home and his execution of the consent to search form two and a half hours later."); *United States v. McSwain*, 29 F.3d 558, 563 (10th Cir. 1994) (finding that first factor "weigh[ed] heavily against finding the taint cleansed" where the defendant consented "only a few minutes after being illegally detained"). Based on the body camera footage, approximately nine minutes elapsed between the officers' intrusion into the box and Defendant's consent. Marin Body Camera at 2:00–10:46.

Second, and more problematically, is the government's misconception of what constitutes an intervening circumstance. The government repeatedly cites to *United States v. Carson*, 793 F.2d 1141, 1157 (10th Cir. 1986) for the proposition that voluntary consent "is an intervening act free of police exploitation of the primary illegality and is sufficiently distinguishable from the primary illegality to purge the evidence of the primary taint." Gov't Closing Arg. at 5 (citing *Carson*, 793 F.3d at 1147–48). Building on this premise, the government argues that Defendant's consent was, in and of itself, an intervening circumstance which broke the causal connection between the illegal search and the voluntary consent. *Id.* at 7.

Eight years after *Carson* was published, the Tenth Circuit explicitly rejected that panel's decision to merge voluntary consent with intervening circumstances. *United States v. Melendez-Garcia*, 28 F.3d 1046 (10th Cir. 1994) denounced *Carson* for "blurr[ing]" the "dual requirement of voluntariness and sufficient independence from the prior illegal arrest." *Id.* at 1054. The court explained:

> While there is a sufficient overlap of the voluntariness and fruits tests that often a proper result may be reached by using either one independently, it is extremely important to understand that (i) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it

---

apart, they are not determinative of the first factor.

25

> is determined that the consent was *both* voluntary and not an exploitation of the prior illegality.

*Id.* at 1054–55 (quoting Wayne R. LaFave, 3 Search and Seizure § 8.2(d) at 190 (1987)). *Melendez-Garcia* "reiterate[d] that not only must the government show that consent is voluntary in fact, but it must also demonstrate a break in the causal connection between the illegality and the consent[.]" *Id.* The Tenth Circuit reaffirmed this rule in *Fox* and found that the district court had "clearly erred in suggesting that Ms. Chiles's voluntary consent itself was an intervening circumstance." 600 F.3d at 1260. To the contrary, a defendant's consent is "not in itself an intervening event which could remove the taint of the prior illegal seizure." *Id.*; *see also Jiron v. Roth*, 519 F. Supp. 3d 971, 997 (D.N.M. 2021) ("[T]he Tenth Circuit has made clear that a person's voluntary consent cannot itself constitute an intervening circumstance."). Under this precedent, the government's position that "a search conducted pursuant to voluntary consent is a sufficiently distinguishable means of obtaining evidence to purge it of the taint of the primary illegality" is untenable. Gov't Closing Arg. at 7 (citing *Carson*, 793 F.2d at 1150).

A. <u>Minimal time separated Defendant's consent from the illegal search.</u>

"The longer the time lapse between the initial illegality and the acquisition of the challenged evidence, especially where the evidence is verbal, the more likely such evidence has been purged of the illegality's primary taint, i.e., has become attenuated." *Shrum*, 908 F.3d at 1236. A span of only nine minutes between the illegal search and Defendant's consent weighs against attenuation. *Utah v. Strieff*, 579 U.S. 232, 239 (2016) (finding suppression was favored where the officer "discovered drug contraband on Strieff's person only minutes after the illegal stop"); *United States v. Mendoza–Salgado*, 964 F.2d 993, 1012 (10th Cir. 1992) (thirty to forty-five minute period by itself "reveal[ed] little about whether the [time] that elapsed had any effect on [the] decision to permit the search"); *Maez*, 872 F.2d 1444, 1455 (10th Cir. 1989) (thirty minute

26

time period between "the arrest and Mrs. Maez' consents clearly indicate that [the] taint [of the Fourth Amendment] violation was not purged").

B. <u>The only intervening circumstance between the search and the consent was Deputy Madden's *Mirandizing* of Defendant.</u>

As discussed above, the government impermissibly relies on Defendant's consent as an intervening factor. The government then takes a second misstep, perhaps related to its misunderstanding of temporal proximity, by citing Defendant's removal from the scene as an intervening circumstance. Gov't Closing Arg. at 11. Defendant's removal cannot "intervene" in the causal chain because it took place before the search began. The Court does, however, agree with the government's contention that *Mirandizing* the Defendant can assist in separating unlawful conduct from consent. *Maez*, 872 F.2d at 1457 (acknowledging that reading of *Miranda* rights is probative of intervening circumstances). But *Miranda* warnings are not a cure-all for constitutional violations and "do not per se break the causal connection" between illegal conduct and subsequently obtained evidence. *Id.* at 1457 (citing *Dunaway v. New York*, 442 U.S. 200, 217–20 (1979)). The government does not identify additional intervening circumstances. This factor favors suppression.

C. <u>The deputies' conduct was not flagrant nor was it exploited to procure Defendant's consent.</u>

The flagrancy of the officers' conduct is particularly important in determining whether police misconduct tainted the challenged evidence. *See Shrum*, 908 F.3d at 1236, 1239. "[P]urposeful and flagrant misconduct is generally found where: 1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless and 2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." *United States v. Ramos*, 723

F. App'x 632, 641 (10th Cir. 2018).  It is when "police misconduct is most in need of deterrence" that suppression is appropriate.  *Strieff*, 579 U.S. at 241.

The deputies did not act with flagrant disregard for Defendant's Fourth Amendment rights. Though their search of the box's interior crossed the line of a lawful search, that slip was small. There is no evidence that the deputies were acting in bad faith or intentionally performing a solely investigatory search.  Deputy Zagorski's testimony also indicates that he may have had greater latitude to open closed containers in February 2025 than he has now.  It seems that the deputies were at most negligent.  *Strieff*, 579 U.S. at 24.  Moreover, and most importantly to this analysis, the deputies did not exploit the fruits of their search to pressure Defendant into acquiescing. Attenuation doctrine seeks to prevent officers from *exploiting* the fruits of their illegality.  *Wong Sun*, 371 U.S. at 488.  It does not demand "that all evidence is fruit of the poisonous tree because it would not have come to light but for the illegal actions of the police."  *Id.* at 487–88.  Deputy Madden confined his questions to whether Defendant knew about the sealed box.  He never mentions that Deputies Zagorski and Marin saw its contents or that they smelled laundry detergent. While it is true that Deputy Zagorski would not have called Deputy Madden but for the illegal search, Defendant's consent was offered without any knowledge of that search.  *Cf. New York v. Harris*, 495 U.S. 14, 20 (1990).  The Court therefore finds that Defendant voluntarily gave his consent and that it was sufficiently attenuated from the illegal search.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress (Doc. 31) is **DENIED**.

**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**